NATURAL RESOURCES DEFENSE
COUNCIL et al., Plaintiffs,

v.

Royston C. HUGHES et al., Defendants.

Civ. A. No. 75-1749.

United States District Court,
District of Columbia,
Civil Division.

Sept. 27, 1977.

Edward L. Strohbehn, Jr., Bruce J. Terris, Washington, D. C., for plaintiffs.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., for Federal defendants.

Gerry Levenberg, Washington, D. C., for intervening defendant.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

### Introduction

Plaintiffs in this action seek declaratory and injunctive relief to restrain defendants from further implementation of a new Federal Coal Leasing Program, and from entering into any coal leases unless and until defendants comply with their statutory ob-

ligations under § 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1970), *as amended*, Act of Aug. 9, 1975, Pub.L. No. 94–83, § 1, 89 Stat. 424.

Plaintiffs allege that if the new Federal Coal Leasing Program is fully implemented they and their members will suffer irreparable injury in the form of, *inter alia*, destruction of land by strip mining, threats of pollution to ground and stream water, and harm to animals, crops, and vegetation from air pollution. It is further alleged that the environmental degradation which will occur from the implementation of the program was not adequately reflected in the Program's Environmental Impact Statement as required by § 102 of NEPA.

This case is before the Court on cross-motions for summary judgment. Upon consideration of the full record herein, we hold that plaintiffs are entitled to summary judgment. The material facts are not in dispute.

### A. *Parties.*

Plaintiffs Natural Resources Defense Council, Inc. (NRDC), Environmental Defense Fund, Inc. (EDF), Northern Plains Resource Council (NPRC), and Powder River Basin Resource Council (PRBRC), are non-profit membership corporations. Each plaintiff was formed, *inter alia*, for the purpose of promoting the conservation and the protection of the natural resources of the public lands and minerals.

(1) Defendant Robert Mendelsohn, Assistant Secretary Designate of the Department of the Interior for Policy, Budget, and Administration, serves a staff function to the Secretary in making decisions relating to the implementation of the Department's coal leasing program.[1] The Assistant Secretary reviews and endorses all draft and final Environmental Impact Statements (EIS) for the Department.

(2) Defendant Cecil Andrus is Secretary of the Interior.

(3) Defendant Curtis J. Berklund is the Director of the Bureau of Land Management (BLM) of the Department of the Interior and has been delegated authority by the Secretary of the Interior for the conduct, operation and activities of said Bureau, including implementation of the Department's coal leasing program.

(4) Intervenor-Defendant Utah Power and Light Company is the principal electric public utility in the State of Utah.

### B. *Coal Reserves.*

The United States contains an estimated 1.58 trillion tons of identified coal reserves approximately one half of which are located in the western United States. The federal government owns approximately 60% of the western coal resource. Most of the large coal resource in the eastern and midwestern United States is privately owned.

Federal coal has, however, played a minimal role in total U. S. production. In 1960 federal coal accounted for only 1.3% of the total coal mined. This mining share has increased only slightly to its current level approximating 3%.

### C. *Federal Coal Leasing Policy Prior to 1973.*

The Department of the Interior has general authority to manage the public lands of the United States,[2] and the responsibility to provide for the orderly development of the nation's mineral resources,[3] including coal resources. Historically, and until 1970, the coal leasing policy of the federal defendants was reactive in nature, responding to lease requests on a case-by-case basis without regard to the total reserves under lease or the need for additional leasing, and without

---

1. Pursuant to Fed.R.Civ.P. 25(d) the successors to the original federal defendants have been automatically substituted as parties to this action.

2. 18 Stat. 317 (1875), 43 U.S.C. § 2; 60 Stat. 1100 (1946), 43 U.S.C. § 1201.

3. The Mineral Lands Leasing Act of 1920, c. 85 § 1, 30 U.S.C. § 181 (1970), *as amended*, Federal Coal Leasing Amendments Act of 1975, Pub.L. No. 94–377, 90 Stat. 1083 (1976).

an assessment of the environmental impacts of leasing.[4]

In 1970, the Department of the Interior imposed a moratorium on coal leases and prospecting permits. This action resulted from a Bureau of Land Management coal lease study which discovered a sharp increase in the total federal acreage under lease and a consistent decline in coal production. *See* Holdings and Development of Federal Coal Leases, Division of Minerals, Bureau of Land Management, November 1970.

From 1945 to 1970, the number of acres of federal land leased for coal development *increased* from about 80,000 to approximately 778,000, almost a ten-fold increase. In the same period, annual coal production from these federal lands *declined* from about 10 million tons in 1945 to approximately 7.4 million tons in 1970. These leased areas contain an estimated 16 billion tons of coal reserves, 10.6 billion of which are mineable by strip mining. An additional 10 billion tons are potentially recoverable from federal acreage for which "preference right" applications for coal leases have been filed.[5] The additional ten billion tons include quantities of coal which, due to the size of the lease unit, location, or transportation costs, may not be economically recoverable.

## D. *Evolution of the Current Federal Coal Leasing Policy.*

In February 1973, the Secretary of the Interior announced a new coal leasing policy. The policy embodied short-term and long-term actions. The long-term policy consisted of the formulation of a planning system to determine the size, timing, and location of future coal leases, and the preparation of an environmental impact statement with respect to the entire federal coal leasing program.[6] The short-term action included a complete moratorium on the issuance of new prospecting permits, and a near-total moratorium on the issuance of new federal coal leases. Respecting the latter, new leases would be issued only to maintain existing mines or to supply reserves for production in the near future.[7]

In October 1973, the Director of BLM established a schedule for the implementation of a new coal leasing system entitled Energy Minerals *Allocation* Recommendation System (EMARS).[8] The purpose of

---

4. Prior to 1970 there were two ways for private parties to gain access to federal coal under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* (1970). The first was by competitive bidding, in areas where coal was known to exist in workable quantities. If the existence or workability of coal was not known, however, the federal defendants could issue a prospecting permit authorizing exploration. If the permittee discovered coal in commercial quantities, he could apply for a "preference right" lease under 30 U.S.C. § 201(b). This section of the Act granting "preference right" leases has recently been repealed. Federal Coal Leasing Amendments Act of 1975, Pub.L. No. 94–377, § 4, 90 Stat. 1085 (1976).

5. The recent legislation which repealed the Interior Department's authority to grant "preference right" leases under 30 U.S.C. § 201(b), did so "subject to valid existing rights." Federal Coal Leasing Amendments Act of 1975, Pub.L. No. 94–377, § 4, 90 Stat. 1085 (1976).

6. It is noteworthy that the programmatic impact statement prepared for the new coal leasing policy was the first of its kind undertaken by the Department. (Turcott Aff. p. 1). A programmatic statement is one which considers the aggregate effects of a broad federal policy. This is to be distinguished from a regional impact statement or a site-specific statement both of which are designed to assess the environmental impact of individual projects or project areas.

7. On July 6, 1973, the BLM issued implementing instructions for the Secretary's short-term leasing criteria. (I.M. 73–231). In pertinent part the instructions state that "the decision [to issue leases] would be based upon sufficient indications that the applicant needs coal to satisfy an existing market and intends to begin development within three years." *Id.* at § B5. As noted *infra*, at p. 986, these criteria have been superseded by the new short-term standards issued on July 25, 1977.

8. As described in the draft EIS, EMARS was basically a three-part system: (1) allocation, (2) tract selection, and (3) leasing. During the *allocation* process federal agencies related inventoried federal coal resources to projections of coal-derived energy needs. Total national energy needs were disaggregated into regional demands for coal derived BTU's. In the *tract*

this new system was to allow the Interior Department to resume the issuance of federal coal leases by providing a mechanism for shifting to an environmentally acceptable coal leasing program.

In May 1974, approximately seven months after the announcement of the proposed leasing program, the *draft* programmatic environmental impact statement (DEIS) was filed by the Interior Department with the Council on Environmental Quality [9] (CEQ).

The release of the DEIS was followed by four months of public commentary during which five open hearings were held throughout the country. Approximately seven hundred pages of suggestions and criticism were received by the Department of the Interior. Among those comments were requests by the CEQ and the Environmental Protection Agency (EPA) that a new draft EIS be prepared.[10]

Other federal agencies were almost universally critical of the draft statement.[11]

In September 1975, the *final* programmatic EIS was released with some modifications. Prominent among the amendments were those which changed the Energy Minerals *Allocation* System to an Energy Minerals *Activity* System.

The primary distinction between the first and the second systems is that the *alloca-*

---

*selection* phase, federal coal leasing targets were then established in each region or area, flowing from the total national projections for coal based energy needs. The *leasing phase* was to begin with a detailed pre-planning of the coordinated mining and rehabilitation factors required for reclamation and subsequent surface resource management. This phase would conclude with (A) pre-sale evaluations, (B) lease sales, (C) post sale evaluation procedures, and (D) lease issuance. (Pl. Ex. 1, pp. I–2—I–5).

9. A few days *prior* to the release of the DEIS, previous federal defendant Hughes, then Assistant Secretary for Program Development and Budget, wrote to the Under Secretary of the Interior Department that he (Hughes) had reluctantly released the DEIS despite the fact that it had "major weaknesses." Defendant Hughes anticipated "heavy criticism" of the DEIS on several grounds:
  (1) The BLM's Management Framework Planning System—"the heart of the decision-making process"—was not well explained;
  (2) The description of EMARS was out of date, and did not adequately explain the nominations process. Further, the alternatives to EMARS as a decision-making process were not discussed;
  (3) The pertinent BLM regulations and the new geological survey coal regulations were not fully considered;
  (4) Several major points of policy such as "preference right" leasing, diligence requirements, possible limitations on development of old lease, public notice of proposed actions, and the alternatives to these, were not sufficiently analyzed. (Pl. Ex. 4).

10. The CEQ concluded in its September 6, 1974 letter to Secretary Morton, "You and your staff, the President, Congress, other agencies and the public need the best possible information on which to formulate intelligent policy decisions on a program of such importance to the nation. An adequate program environmental impact statement can, at least in part, serve this purpose. *Unfortunately, the informational and analytical deficiencies of the current draft EIS prevent it from doing so.* (Emphasis added). We believe, therefore, that a new draft environmental impact statement is necessary." (Pl. Ex. 2, pp. 9–24).

The EPA concurred in its September 1974 commentary addressed to Mr. Berklund, Director of BLM, stating:
  "We believe that the policies which are developed by the Department of the Interior to manage coal lands and resources are of paramount importance to the environment. The environmental impact statement (EIS) should describe clearly the policy alternatives, and analyze their environmental consequences. This EIS fails to specify policy alternatives and only describes environmental consequences of coal mining in general. It therefore fails to meet the criteria of an adequate impact statement. *We strongly recommend the Bureau [of Land Management] evaluate the comments received and re-issue the statement once again as a draft environmental impact statement.* (Emphasis added).
  "In accordance with our procedure of rating environmental impact statements at the draft stage, we are rating this statement as category 3 (inadequate)." (Pl. Ex. 2, pp. 9–25).

11. For example, the Atomic Energy Commission, *in its staff report on the DEIS*, dated September 18, 1974, commented:
  "Without discounting the considerable effort that was evidently expended to prepare this report, we suggest that it falls far short of its purpose, and that any future proposals to lease federal coal lands will be vulnerable to attack on environmental and conservationist grounds unless a more substantial case can be made." (Pl. Ex. 2, pp. 9–39).

*tion* process emphasized interdepartmental *federal* identification of coal reserves to be considered for leasing, whereas the *activity* system relied almost entirely upon industry and public nominations for the ascertainment of reserve tracts ripe for development.

The Secretary of the Interior, on January 26, 1976, announced the implementation of the new coal leasing policy (the long-term plan) based upon, *inter alia*, adoption of the Energy Minerals *Activity* Recommendation System. The new policy expressly lifted the moratorium on new major federal coal leasing which had been in effect since late 1970. The Secretary announced, however, that the short-term policy would be retained until the new competitive coal leasing system was fully operational.

In February 1976, the Assistant Comptroller General of the United States, Phillip Hughes, testified before the Senate Interior Subcommittee on Minerals, Materials and Fuels on the new coal leasing program. Mr. Hughes pointed out that the GAO had recently completed a study concluding that the *need* for a new federal coal leasing policy had *not* been clearly established, and that if such a need did in fact exist the Interior Department could not, under the new system, effectively administer a coal leasing program. (Pl. Ex. 19, at 2).

On April 1, 1976, the Comptroller General submitted a 70-page report to Congress outlining the deficiencies of the new program as analyzed by GAO.[12]

On May 7, 1976, the Secretary of the Interior issued new regulations which effectively exempted "preference right" lease applications from the short-term criteria. 43 C.F.R. § 3521.1 (1977). The effect of these regulations was to confine the Department's short-term criteria to competitive leasing; "preference right" leases could and were issued without reference to the short-term criteria.

The Interior Department on June 1, 1976, issued a call for the nomination of specific federal coal leasing tracts as suitable or unsuitable for federal leasing. Also on that date, final regulations clarifying the procedures for the implementation of EMARS were issued. 43 C.F.R. § 3520 (1976), revised at 42 Fed.Reg. 4,452–57 (1977), (to be codified in 43 C.F.R. § 3525).

The Bureau of Land Management, on August 9, 1976, issued a statement that, pursuant to the nominations process which ended July 31, 1976, coal companies and private individuals had identified 680 tracts in eight states as areas upon which they would bid if offered for federal coal lease.

The Secretary on July 25, 1977 adopted new short-term leasing standards to correct abuses in short-term leasing under previous criteria. Federal Defendants' Memorandum in Response to the Court's July 5, 1977 Request, Appendix IV. These revised standards also would permit the issuance of any "preference right" lease, on an *ad hoc* basis, without limitation, and any competitive lease if,

(1) the lessee controls land which is contiguous to the land to be leased (there is no requirement that there be an existing mine in operation); and

(2) the amount of reserves to be leased does not exceed eight years as contracted for or expected levels of production; and

(3) no new major transportation facilities are to be constructed.

It is plaintiffs' basic contention that defendants' actions as outlined above have been pursued in the absence of an adequate final programmatic EIS and are therefore unlawful and invalid. We turn now to defendants' response on procedural as well as substantive grounds.

### E. *The Defendants' Jurisdictional Challenge.*

■ In their challenge to the jurisdiction of this Court, defendants argue that a

---

12. The Comptroller General recommended:

"... that Interior defer issuing new leases until it has established a workable and effective administrative mechanism for implementing a federal coal-leasing program." (Pl. Ex. 27, at 28, 51, 63).

recent amendment to the Mineral Leasing Act of 1920 [13] expresses Congressional intent to confirm (or reaffirm) the new Coal Leasing Program and to adopt that program in its present form. Defendants state that Congress' willingness to accept the new program in its current posture renders the issue of the adequacy of the Coal Programmatic EIS moot. This contention is without merit.

After a careful review of the legislative history of the 1975 coal leasing amendments, we are unable to discover any evidence of Congressional intent to exempt the new coal leasing policy from the requirements of NEPA.[14] Without such a showing, the argument of lack of jurisdiction must fail.

## F. The Defendants' Claim That The Controversy Is Non-Justiciable.

Defendants next contend that plaintiffs' challenge to the sufficiency of the final programmatic EIS is non-justiciable unless and until the program which is discussed in the EIS is implemented by specific, concrete application. This requires no extended response.

The Supreme Court's observation in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), a case which involved the question whether a regional EIS was required at all rather than the issue of non-justiciability, is relevant to defendants' assertion:

"The time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement. This is the point at which an agency's

action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption. With the issuance of the final programmatic EIS and the implementation of the new coal leasing policy, this claim that the actions of the defendant have not sufficiently matured is impossible to accept. The issues raised herein are ripe for decision." 427 U.S. at 406, n. 15, 96 S.Ct. at 2729.

The claim that the actions of defendants have not sufficiently matured is impossible to accept. The issues raised herein are clearly justiciable.

## G. Duty to Comply With § 102 of NEPA.

The applicability of NEPA is not an issue in this proceeding. The Interior Department has conceded in this litigation, as well as in recent argument before the Supreme Court, that it was indeed required to prepare the Coal Programmatic EIS under § 102(2)(C) of NEPA.

"Similarly the federal petitioners agreed at oral argument that § 102(2)(C) required the Coal Programmatic EIS that was prepared in tandem with the new national coal leasing program and included as part of the final report on the proposal for adoption of that program. Tr. of Oral Arg. 9. *Their admission is well made, for the new leasing program is a coherent plan of national scope and its adoption surely has significant environmental consequences.*" (Emphasis supplied) *Kleppe v. Sierra Club, supra,* at 400, 96 S.Ct. at 2726.

In view of this concession, it is not necessary to make the threshold determination that the elements which trigger the requirement of an EIS are present under the facts of this case.

---

**13.** The Federal Coal Leasing Amendments Act of 1975, P.L. 94–377, 90 Stat. 1083 (1976).

**14.** In the past, Congress has specifically mooted pending litigation concerning the adequacy of an EIS. During the Trans-Alaska pipeline controversy, the legislature exempted that final EIS from additional judicial review by providing that:

"The actions taken pursuant to this title which relate to the construction and completion of the pipeline system, and to the applica-

tions filed in connection therewith necessary to the pipeline's operation at full capacity, as described in the Final Environmental Impact Statement of the Department of the Interior, *shall be taken without further action under the National Environmental Policy Act of 1969 . . . .*" (Emphasis added). Trans-Alaska Pipeline Authorization Act, P.L. 93–153, § 203(d), 87 Stat. 576. *See generally* Conf.Rep. No. 93–624, 93d Cong., 1st Sess., reprinted in [1973] U.S.Code Cong. & Admin.News, p. 2529.

H. *Adequacy of Compliance With § 102 of NEPA.*

Defendants, on the merits, contend that the final programmatic EIS issued September 19, 1975, complies with the requirements of NEPA. We examine this contention in some detail, starting off with the language of the statutory provision.

In pertinent part, § 102 of NEPA provides that "to the fullest extent possible" all agencies of the Federal Government shall

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

A few observations as to the effect of the statutory obligations and our function as a reviewing court are appropriate at this point.

■ This provision compels all federal agencies to satisfy its requirements absent clear and unavoidable conflict in statutory authority. *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 788, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). Section 102 duties are not inherently flexible. They must be complied with "to the fullest extent." *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 39, 449 F.2d 1109, 1115 (1971). This is a "high standard . . . which must be rigorously enforced by the reviewing Courts." *Id.*

In performing its function of review, "[t]he Court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Concerned About Trident et al. v. Rumsfeld et al.*, 555 F.2d 817, 827 (D.C.Cir. 1976).

Our review is also subject to certain limitations. As the Supreme Court recently pointed out:

"Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. (Citation omitted). The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2731.

The determination as to whether, when, and how to lease more federal coal remains largely within the Secretary's discretion. Our sole obligation in this action is to ascertain whether the final programmatic EIS filed herein has satisfied the statutory criteria of NEPA.

Although NEPA merely requires an agency to file a final impact statement, 42 U.S.C. § 102(2)(C), the CEQ has severed the process into two parts, requiring a Draft Environmental Impact Statement (DEIS) and a Final Environmental Impact Statement (EIS). Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.7(a) (1975).

With regard to the DEIS, the Guidelines state:

Each environmental impact statement shall be prepared and circulated in draft form for comment in accordance with the provisions of these guidelines. *The draft statement must fulfill and satisfy to the*

*fullest extent possible at the time the draft is prepared the requirements established for a final statement by section 102(2)(C).* (Emphasis added). 40 C.F.R. § 1500.7 (1975).

Although courts have construed the legal status of these regulations as advisory and not entitled to binding effect, *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424 (5th Cir. 1973), it is important to note when considering their weight that the President delegated the authority to the CEQ to issue these guidelines as to the manner of agency compliance with section 102 of NEPA. Exec. Order No. 11514, 3 C.F.R. 1966–70 Comp.P. 902. Both the Department of the Interior and the BLM have promulgated regulations specifically governing the preparation of the draft statements.[15] In our view, neither the DEIS nor the Final Programmatic EIS complies with these regulations. As has been previously set forth (p. 985, *supra*) the DEIS when released in May 1974 was the object of heavy criticism from various federal agencies, environmental groups, representatives of the coal industry, and even employees of the Interior Department (such as former Assistant Secretary Hughes). (Pl. Ex. 2, at 9–21, 9–92).

The commentary critical of the DEIS was directed more recurrently toward, *inter alia,*

(a) the inadequacy of the Department's explanation of the EMARS program, and

---

**15.** The Department Manual, *supra*, ch. 2, § 9.B(1), 36 Fed.Reg. 19346 (1971), 43 C.F.R. § 516, mandates the draft statement to be "as complete as possible." The BLM manual requires, with greater specificity, that the draft statement be one "analyzing the best information available regarding the possible environmental impacts of an action and all reasonable alternatives." BLM Manual § 1792.05(D)(1), 37 Fed.Reg. 15016 (1972).

The United States Court of Appeals for the District of Columbia Circuit has most recently held that the promulgation of regulations by the Defense Department implementing NEPA's provisions bound that agency to follow those guidelines. *Concerned About Trident et al., supra,* at 823. The Department of the Interior and BLM, having issued similar regulations, would appear to be bound thereby.

(b) the paucity of alternatives to the proposed leasing policy (i. e., the Department's insufficient showing that the institution of a national coal leasing program was even necessary).

We believe these comments to be equally applicable to the Final EIS inasmuch as there have been no significant remedial changes in the above two areas nor in numerous other sections of the statements.

(a) The EMARS System.

The EMARS System, which is the "heart" of the new national coal leasing policy, is set out in only four of the Draft Programmatic's 700 pages. (Pl. Ex. 1, at I–1a—I–4).[16]

In the Final Programmatic EIS, although the length of the EMARS explanation had increased to 11 pages (Pl. Ex. 2, at K–12—I–23), the original Energy Minerals *Allocation* Recommendation System was substantively changed to the Energy Minerals *Activity* Recommendation System without the proper explanation.[17]

■ This important amendment substituted a procedure of industry nominations, designed to provide BLM with data as to the location and quantity of coal to be leased, for the original allocation system in which federal agencies related inventoried Federal coal resources to national projections of coal-derived energy needs.[18] While

---

**16.** In light of the statutory policy that an impact statement should be available for informed public commentary prior to its final release, the EPA observed:

"The (Draft) impact statement presents no detailed description of EMARS that permits readers to make an informed judgment of its ability to evaluate and integrate critical policy factors." (Pl. Ex. 2, at 9–24).

**17.** The Final Statement merely indicated "the description of the proposed EMARS process has been rewritten and expanded to reflect comments and suggestions received." (Pl. Ex. 2, at 9).

**18.** In its recent report to Congress on the final coal leasing proposal, the GAO made the following critical comment concerning the second EMARS system:

it is outside the scope of our review to consider the respective merits of the two programs, we believe that this amendment constitutes a significant departure from the first EMARS system and, hence, a detailed comparative explanation would be required under NEPA. This was not provided. It is not difficult to conclude that neither the distinction between these two programs, nor the potential ramifications thereof, were adequately considered in the Final EIS. Nor was the public afforded an opportunity to comment upon this substantial modification.

This lack of detailed exploration in the Final Programmatic EIS contravenes (1) the purpose of NEPA as "an environmental full disclosure law," *Monroe County Conservation Council v. Volpe*, 472 F.2d 693, 697 (2d Cir. 1972), and (2) the statutory requirement of inter-agency and public consultation prior to the release of a Final Impact Statement. 42 U.S.C. § 4332(C).

We hold the Final EIS to be inadequate with regard to the section concerning EMARS. To comply reasonably and in good faith with section 102 of NEPA, the Department of the Interior must expand its EMARS explanation through the issuance of a supplemental draft programmatic statement consistent with the Order attached hereto.

(b) Lack of alternatives to the present policy.

■ With regard to the alleged inadequate explication of alternatives, it is well settled that NEPA requires an exploration of all reasonable alternatives. *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 15, 458 F.2d 827, 837 (1972). At the same time, the statute does not impose an obligation to consider every re-

mote possibility. *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975). What is required is information sufficient to permit a reasoned choice of alternatives. *Natural Resources Defense Council, Inc. v. Morton, supra,* 148 U.S.App.D.C. at 14, 458 F.2d at 836.

■ Two types of alternatives emerge in the factual context of this case and should be considered. The first is *whether* a new program should be undertaken at all. This is the alternative of "no action." The second is, if such a program is found to be necessary, *what type* of system should be utilized.

Absent from the Draft Programmatic EIS was any mention or consideration of the first alternative of "no action."[19] This is the most significant alternative, since only an adequate explanation for its rejection can provide the new program with its very *raison d'etre*. The detailed consideration of "no action," and its thoughtful rejection by the Department, would have laid the groundwork for the consequent implementation of the new policy. Yet the Draft was silent on this point. Since this option was not included in the DEIS and since a second draft was not issued for comment, the public as well as governmental agencies were deprived of their statutory right to comment thereon. 42 U.S.C. § 4332(C), *supra*.

The Final Statement perfunctorily devoted a few paragraphs to the "no action" alternative. (Pl. Ex. 2, at 8–32). Apparently, the Department and the BLM believed this to be sufficient to fulfill their regulatory obligations which specifically require the consideration of the "no action" alternative.[20] It appears, however, that the

"Interior indicates that specifying exact demands on Federal Coal is impossible beyond saying that greater amounts of coal are anticipated to come from federal lands. While exact long-term demands might not be measurable, we believe that Interior should have reasonable goals of how much to lease and when to lease, based on the best possible estimates of how much coal to expect from

developing the leases." (Pl. Ex. 27, at 11). Such data is not provided in the Final EIS.

**19.** Since the short-term leasing policy, *supra,* was in effect when the new leasing program was adopted, the effect of accepting the "no action" alternative would merely have been to retain the short-term policy.

**20.** BLM Manual § 1792.22C(8), 37 Fed.Reg. 15018 (1972); Department of the Interior Man-

Department's treatment of this alternative is sufficient neither under the statute nor under the regulations.

Defendants' position in support of the program, i. e., that because federal coal production is rapidly increasing more federal coal must be leased, is countered by the plaintiffs' response that the argument ignores the magnitude of the amount of coal currently under lease. Plaintiffs cite the BLM coal reserve statistics which reveal that approximately 26 billion tons of potentially recoverable federal coal are presently under lease. (Pl. Ex. 2, at 1–84). At the estimated 1985 rate of federal coal production (320 million tons per annum) plaintiffs state that these outstanding leases would provide enough coal for the next 121 years.[21] (*Id.* at 1–84, Table 1–28).

As is noted previously, coal mined on federal lands constitutes only 3% of all coal mined in the United States. Even with a significant increase in production, the BLM figures reveal that the amount of federal coal currently under lease could satisfy such a demand for many decades. Therefore, an anticipated eighteen-month delay in the issuance of major new leases, caused by the issuance of the injunction sought by plaintiffs (Turcott Aff. ¶ 17), would in our judgment have no significant effect upon the availability of coal in the United States.

In light of these statistics, the threshold question as to *whether* the proposed policy is even *necessary* should have been addressed and considered in depth. The cursory treatment of the "no action" alternative provided in the Final EIS does not satisfy the statutory mandate of § 102(C) of NEPA. *See Calvert Cliffs', supra,* 146 U.S. App.D.C. at 38, 449 F.2d at 1114. The Department did not take a "hard look" at

this policy option during its decision-making process. The Department must therefore also consider the "no action" alternative in a supplemental draft statement to be issued consistent with the Order attached hereto.

While we have focused specifically upon two deficiencies, our criticism is not confined to those areas. Numerous other aspects of the Final EIS were the topic of agency and public criticism. These areas, such as lack of administrative alternatives to the program and the failure to relate the new program to coal already under lease, shall also be reconsidered by the Department in the supplemental Draft Statement.

To conclude, the environmental consequences of any national coal leasing program cannot be gainsaid and require no elaboration. The program under consideration was the result of a decision apparently made long before and apart from the preparation of the Draft EIS. Because of its inadequacy, both government agencies and the public were deprived of a meaningful opportunity to comment. The Final EIS suffers from similar inadequacies as well as the fact that its finality prevented comment even though the original EMARS, the core of the program, had been drastically changed. The undisputed facts show a clear violation of the letter and purpose of NEPA.

### I. *The Appropriateness of Injunctive Relief.*

■ Defendants state that the issuance of an injunction prohibiting the continuation of the new coal leasing policy will substantially inhibit the development of long-range national energy planning. We can find no evidence in the record to support this allegation.

---

ual Part 516, ch. 2, § 6.C(8), 36 Fed.Reg. 19345 (1971).

**21.** With regard to this issue, the GAO report, *supra,* stated:

"Presently, the national coal production goal is 1.2 billion tons a year by 1985 which was set by the President in his energy message of January 1975. It should be clear (1) what portion of the projected 1.2 billion tons will have to come from federally owned coal lands and (2) wheth-

er Federal coal reserves now under lease or committed to preference right leaseholders can satisfy this need. As of February 1976, Interior did not have the answers to these questions. Consequently, Interior does not have an adequate basis for determining whether additional coal is needed and, if so, how much coal should be leased to meet national production goals." (Pl. Ex. 27, at 10).

The criticisms of the new leasing policy submitted by various government agencies directly concerned with the formulation of national energy policy, such as the Atomic Energy Commission, do not allege countervailing circumstances such as the existence or anticipation of a national coal shortage which would be exacerbated by the temporary suspension of the new leasing program. In fact, the Commission suggested major revisions in the proposal before Federal coal lands should be reopened for leasing. (Pl. Ex. 2, at 9–39).

██ Defendants further argue that regardless of the outcome of the issue of the adequacy of the Final EIS, they may issue leases if a separate impact statement has been prepared for each proposed lease when required by NEPA. As an initial proposition in a different factual setting, this may be true. We are not concerned with individual leases but rather the formulation of a national coal leasing policy. If regional or site-specific EIS's are permitted to act as curative of programmatic deficiencies and as a substitute for a Final EIS, the policy of long-range environmental planning would be defeated.[22] Thus, the filing of separate site-specific EIS's are not a substitute for an adequate final programmatic EIS.

██ Most recently, defendants assert that this case is now moot because of a change in position arising from the President's Environmental Message to Congress of May 23, 1977, directing that federal coal lands be managed in an environmentally sound manner. Defendants indicate that they will comply with NEPA before adopting new policies and procedures in accordance with the President's directive. Feder-al Defendants' Memorandum in Response to the Court's July 5, 1977 Request. As plaintiffs properly point out, defendants' revised short-term leasing criteria will permit extensive new federal leasing on a large scale during the review and revision of the present national coal leasing program. Plaintiffs' Reply to Federal Defendants' Memorandum in Response to the Court's July 5, 1977 Request. The issues presented herein are not moot.

This Circuit has recently held that when an action is undertaken which violates NEPA, there is a presumption that injunctive relief should be granted against the continuation of the action until the agency complies with the statute. *Realty Income Trust v. Eckerd*, 564 F.2d 447 at 456 (D.C.Cir. 1977); see *Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 377, 499 F.2d 502, 513 (1974). In this action the Interior Department has clearly violated NEPA by its release of an inadequate programmatic impact statement. The Final EIS was not prepared with objective good faith nor would it permit a decision-maker to fully consider and properly balance the environmental factors. *Concerned About Trident et al. v. Rumsfeld et al., supra,* at 827.

The irreparable injury to the environment which would be caused were the new national coal leasing policy to continue is clear. The plaintiffs have satisfied the requirements for injunctive relief.

There are no material issues of fact in dispute and plaintiff is entitled to judgment as a matter of law.

An Order consistent with the foregoing has been issued this day.

**22.** Defendants also argue that "preference right" lease applications are to be considered on an "ad hoc" basis and hence outside the purview of the National Leasing Program. Therefore, defendants state that such leasing should not be subject to any court order relating to the National Leasing Program. We disagree. After careful review of the record we have determined that when the Final Programmatic EIS was released, "preference right" leases were consistently referred to as a part of the National Program. (Pl. Ex. 2, summary ¶ 2, §§ 1–80, 8–29, 8–32). There is no evidence in the Final Statement or any facts offered by defendants which would lead us to conclude that the "preference right" applications were outside the ambit of the Program. For the purposes of this injunction and compliance with NEPA, "preference right" leasing will also be enjoined until the Programmatic EIS deficiencies are remedied.

## ORDER

This cause having come on for hearing, upon notice, on cross-motions for summary judgment filed by all parties herein, based upon the complaint and answer. the answers of the federal defendants to the interrogatories and requests for admission propounded by plaintiffs, and various affidavits and exhibits filed by the parties; and

This Court having carefully considered all the evidence and having determined that the federal defendants have violated the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* (1970) ("NEPA"), in their formulation, adoption and implementation of a new federal coal leasing program; and

It appearing to this Court that unless restrained or otherwise ordered, the federal defendants, until the President's Environmental Message to Congress of May 23, 1977 is fully implemented, will continue to carry out the new federal coal leasing program without complying with NEPA; and

This Court finding that such action by defendants would cause irreparable injury to the interests of plaintiffs and the general public; it is hereby

ORDERED, that plaintiffs' motion for summary judgment as against the federal defendants be and hereby is granted, and the motions for summary judgment of the federal defendants and defendant-intervenor Utah Power and Light Company be and hereby are denied.

It further appearing that federal defendants have violated their mandatory, nondiscretionary duty pursuant to NEPA to consider fully all the environmental impacts of, and alternatives to, a new federal coal leasing program before deciding to adopt and implement that program, it is further

ORDERED, that federal defendants, their agents and employees, and all those in concert or participation with them, are enjoined from taking any steps whatsoever, directly or indirectly, to implement the new coal leasing program, including calling for nominations of tracts for federal coal leasing and issuing any coal leases, except when the proposed lease is required to maintain an existing mining operation at the present levels of production or is necessary to provide reserves necessary to meet existing contracts and the extent of the proposed lease is not greater than is required to meet these two criteria for more than three years in the future *; and it is further

ORDERED, that federal defendants, their agents and employees, and all those in concert or participation with them, are enjoined from failing to take all steps necessary to correct the violations of law found by this Court to have occurred, including specifically the following actions:

(1) Within 60 days of the entry of this Order, the federal defendants shall issue an official press release, publish a notice in the *Federal Register*, and take all other steps it believes appropriate (including sending an announcement to all those who have previously commented on the draft or final federal coal leasing programmatic EIS) to achieve widest possible dissemination of its announcement that it will reevaluate its coal leasing program and policy and that it will accept comments on the final EIS issued in September 1975 for 60 days after publication of the announcement in the *Federal Register.*

(2) Thereafter, defendants shall prepare and publish a *draft* supplement to the final EIS, seeking to correct the defects found by this Court to exist, and responding to the significant issues raised in comments previously received on the draft and final EIS's. Publication of this draft supplement should be announced by appropriate notice in the *Federal Register* and elsewhere, as indicated above, and circulated to all interested federal, state and local governmental agencies and interested members of the general public. Comments shall be expressly invit-

---

* We have deliberately not adopted the defendants' revised short-term criteria of July 25, 1977, for the reason, among others, that said revised short-term criteria would permit defendants to award "preference right" leases without meeting the otherwise applicable requirements of said revised criteria for short-term leases.

ed thereon, with comments received until at least 45 days after the notice of release of the draft supplement is published in the *Federal Register.*

(3) Thereafter, defendants shall prepare a new final EIS, which combines and integrates the material in the draft supplement with the final EIS previously released, which fully responds to the comments received on the draft supplement, and which otherwise fully complies with NEPA.

(4) After the new final EIS has been made available to the public and is on file with the Council on Environmental Quality for at least 30 days, the defendant Secretary of the Interior shall personally reevaluate federal coal leasing policy, based on the information contained in the new final EIS, and shall make a new decision as to whether a new leasing program shall be instituted and, if so, what kind of program it should be.

Plaintiffs are awarded their costs of bringing this suit.