**SHELL OIL COMPANY and D. A. Shale, Inc., Plaintiffs-Appellees,**

v.

**Cecil D. ANDRUS, Secretary of the Interior, Defendant-Appellant.**

No. 77–1346.

United States Court of Appeals, Tenth Circuit.

Jan. 25, 1979.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C. (Sanford Sagalkin, Acting Asst. Atty. Gen., Washington, D. C., Cathlin Donnell, U. S. Atty., Albert V. Witham, Sp. Asst. U. S. Atty., Denver, Colo., and Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., with him on brief), for defendant-appellant.

Fowler Hamilton, of Cleary, Gottlieb, Steen & Hamilton, New York City (H. Michael Spence, of Mosley, Wells & Spence, Denver, Colo., Richard W. Hulbert of Cleary, Gottlieb, Steen & Hamilton, New York City and Donald L. Morgan, of Cleary, Gottlieb, Steen & Hamilton, Washington, D.

C., with him on brief), for plaintiff-appellee, Shell Oil Co.

Claron C. Spencer of Senior & Senior, Salt Lake City, Utah (Norma L. Comstock, Denver, Colo., with him on brief), for plaintiff-appellee, D. A. Shale, Inc.

Robert B. Hansen, Atty. Gen., Michael L. Deamer, Deputy Atty. Gen. and Paul E. Reimann, Asst. Atty. Gen., Salt Lake City, Utah, on brief for amicus curiae, State of Utah.

Before SETH, Chief Judge, and LOGAN, Circuit Judge, and STANLEY, District Judge.*

SETH, Chief Judge.

The Secretary of the Interior issued in September of 1964 an administrative complaint asserting that the shale oil placer mining claims here in issue were invalid. The grounds advanced for the contest were that they did not contain valuable minerals on February 25, 1920, nor do such minerals now exist on the claims. There were also applications for patent then pending. The contest proceedings were heard over a five-month period by Administrative Law Judge Dalby in 1967, and he announced his decision in 1970. Twenty-six witnesses appeared; there were some 1700 exhibits, and over 5000 pages of transcript. The Administrative Law Judge concluded that the claims were valid, and that patents should issue.

The Government took an appeal to the Interior Board of Land Appeals (IBLA) in the Department which reversed in 1974 and held the claims to be invalid. (16 IBLA 112). The Secretary of the Interior then ordered the claims to be cancelled. The owners then obtained review of the Secretary's order in the United States District Court for the District of Colorado by these proceedings. The trial court on cross-motions for summary judgment entered judgment for the owners of the claims, and thus held the claims to be valid.

This appeal was then taken by the Government on the administrative record and the judgment of the trial court.

What constitutes a "discovery" and what may be a "valuable mineral deposit" has been the subject of many administrative proceedings and litigation. The "valuable" element has been considered under many interrelated "tests" including intrinsic value, prudent man, and marketability. It would not seem necessary to discuss the many variations. Reference should be made however to the early "prudent man" decision, *Castle v. Womble*, 19 L.D. 455 (1894), to *United States v. Coleman*, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170; *Enfield v. Kleppe*, 566 F.2d 1139 (10th Cir.); *United States v. Zweifel*, 508 F.2d 1150 (10th Cir.); *Adams v. United States*, 318 F.2d 861 (9th Cir.); *United States v. Strauss*, 58 I.D. 567 (1943); *Jefferson-Montana Copper Mines Co.*, 41 L.D. 320 (1912); *United States v. Black*, 64 I.D. 93 (1957); *United States v. Heirs of Stack*, A–28157 (1960). *See also* 7 Rocky Mountain Mineral Law Institute 263; 1 American Law of Mining § 4.31; and 1 Lindley Mines § 98 (3d Ed.).

Under the mining laws, Act of July 4, 1866, Act of May 10, 1872, and Act of June 22, 1874, now generally 30 U.S.C. § 22, public lands of the United States not withdrawn from entry and containing valuable mineral deposits are open for location with some exceptions not here concerned. Nonmineral entries cannot be made on public lands deemed valuable for minerals. 30 U.S.C. § 23 relates to lode claims and § 35 provides that placer claims should be located under like circumstances and conditions and upon similar proceedings as are provided for lode claims. For lode claims there must be a discovery of a vein or lode and also a discovery of a valuable mineral deposit. For a placer claim there need only be a discovery of a valuable mineral deposit. We are here concerned with placer claims located for oil shale before the Mineral Leasing Act of 1920, 30 U.S.C. § 181.

Everything considered, it must be concluded that the "valuable mineral deposit"

---

* Of the District of Kansas, Sitting by Designation.

standard or requirement was not met as to oil shale claims of the type here considered before 1920 as the standards were applied to the metallic minerals. The lack of conformance came about as to the immediate salability of the oil shale or profitability as compared to other minerals. The shale was obviously different in this regard, and for the claims here concerned to be valid as found by the District Court and the Administrative Law Judge, it must be established that oil shale deposits were treated differently by the then General Land Office and the Secretary for the location of placer claims for oil shale.

The record before us does demonstrate that the value element attributed to substantial oil shale deposits to support claims was expressly treated differently than for metallic minerals by the Department of the Interior for the period 1915 to 1960. This was clearly the case as to the Green River Formation on which the subject oil shale claims are located. The mining laws were thus interpreted differently for oil shale by departmental practice, official instructions and decisions.

The record shows the ebb and flow of interest in oil shale during the period 1915 to the present time. It shows the intense interest in it as a source of oil for the Navy and to replace "foreign" oil in 1918. This was a period of decline in domestic crude oil production relative to demand, and dependence on foreign oil increased. The Department of the Interior by its publications and policies strongly encouraged the location of claims on oil shale deposits in the pre-1920 period. In 1913 there was a USGS Bulletin published on the Green River Formation oil shale, and others followed. It was a period of the creation of Naval reserves for oil, and for oil shale. The oil shale reserves for the Navy were created in Colorado and Utah by presidential order in 1916. There was then in Great Britain a method in use for extracting oil from the shale, and no problems were contemplated.

During the period 1918 to 1920 Congress was holding hearings on what became the Mineral Leasing Act of 1920, and eventually placed oil and gas and oil shale under a system of leasing rather than by placer locations. This Act made special reference to existing oil shale claims and did nothing to impair their validity. 30 U.S.C. § 193.

The Department by 1920 had thus determined that oil shale deposits, if demonstrated to contain sufficient oil, were "valuable mineral deposits" although there was no immediate market.

The Government in these proceedings has acknowledged that these claims met the discovery requirements under the 1916 to 1920 standards applied by the Department of the Interior. This was because there had been an administrative determination that valid locations could then be made on the Green River Formation oil shale beds if all other elements of a proper location were present. The geology was obviously well known, uncomplicated, and the beds were conspicuous.

After 1920 the Department of the Interior continued to patent pre-1920 oil shale claims, and the record shows that there was a careful examination of patent applications for compliance with the mining laws and to determine whether substantial oil reserves were present. There is nothing in the record before us to indicate any routine approval of such claims.

In 1927 the departmental decision in a contest between a homestead entry and an oil shale claim was issued, captioned in part *Freeman v. Summers*, 52 L.D. 201. This decision referred to *Castle v. Womble*, 19 L.D. 455, and held in substance what had been the prior administrative determination that oil shale could be considered a valuable mineral deposit.

*Freeman v. Summers* in part says:

"While at the present time there has been no considerable production of oil from shales, due to the fact that abundant quantities of oil have been produced more cheaply from wells, there is no possible doubt of its value and of the fact that it constitutes an enormously valuable resource for future use by the American people.

"It is not necessary, in order to constitute a valid discovery under the general mining laws sufficient to support an application for patent, that the mineral in its present situation can be immediately disposed of at a profit."

And also:

"The evidence in this case shows that in this particular area of Colorado the lands contain the Green River formation, and that this formation carries oil shales in large and valuable quantities; that while the beds vary in the richness of their content, the formation is one upon which the miner may rely as carrying oil shale which, while yielding at places comparatively small quantities of oil, in other places yields larger and richer quantities of this valuable mineral.

"In other words, having made his initial discovery at or near the surface, he may with assurance follow the formation through the lean to the richer beds.

"There can be no question whatever as to the greater value of the lands for their oil-shale deposits than for other purposes. Their agricultural value is negligible; their value for grazing purposes is nominal, and the real and principal value is the mineral deposit."

This determination as to value continued from 1916 to 1960, and patents were issued for oil shale claims. Some 2326 patents so issued. The *Freeman* decision was not particularly significant at the time, but in 1930 became the center of attention. The 1931 Report of the Secretary of the Interior stated that by then some 195,000 acres had been patented. He also estimated that the "oil shale area" in Colorado consisted of 1,496,-027 acres, in Utah 2,754,950 acres, and in Wyoming 4,006,805 acres.

There were also "Instructions" of general application issued by the Secretary of the Interior relative to the handling of applications to patent oil shale claims, dated May 10, 1920. *See* 47 L.D. 547–551. This was in response to a request for instructions from the Commissioner of the General Land Office in April 1920 relative to the first oil shale patent to be issued after the Mineral Leasing Act—the La Paz claims. These Instructions said in part: "Oil shale had long been recognized as a valuable mineral deposit and for many years the mining of such deposits and distillation of petroleum and other mineral substances therefrom has been an extensive industry in Scotland, . . . While there are no oil shale operations in the United States that have reached that point of commercial development or production . . . ," there are publications as to processes and some experimental plants. The Instructions also refer to the requirement that homestead entries are subject to restrictions as to oil shale. The Instructions then concluded:

"Oil shale having been thus recognized by the Department and by Congress as a mineral deposit and a source of petroleum, and having been demonstrated elsewhere to be a material of economic importance, lands valuable on account thereof must be held to have been subject to valid location and appropriation under the placer mining laws, to the same extent and subject to the same provisions and conditions as if valuable on account of oil or gas. Entries and applications for patent for oil shale placer claims will, therefore, be adjudicated by your office in accordance with the same legal provisions and with reference to the same requirements and limitations as are applicable to oil and gas placers."

There were before and after the time we have mentioned several instances of similar administrative determinations that entries could be made for specified minerals. These included in 1883 lands containing borax, sulphur, alum, and nitrates of soda, and Congress in 1892 had declared that lands containing building stone were subject to placer location. Also Congress changed the law in 1955 so that sand, gravel, and other common varieties were no longer "valuable mineral deposits" to permit locations. Thus from time to time certain minerals or substances were declared subject to location, and also changes made when the need arises.

Thus the Department continued to examine applications, and, if approved, to issue patents for oil shale claims in accordance with the Instructions and the *Freeman* opinion as any other patents, and some 2326 oil shale patents were issued. There was a period of time from about September 30, 1930, to the middle of 1931 when the issuance of oil shale patents was suspended. This period will be considered hereinafter.

The departmental standards for the examination of applications for patent of oil shale claims continued in the manner described above until the end of September 1930. By that time some 1,171 patents had issued on oil shale claims. The processing of patent applications stopped because a Mr. Kelley, who was Chief of the Field Division of the General Land Office in Denver, then published his letter of resignation. This letter attacked the departmental policies as to the issuance of patents for oil shale claims, and attacked the decision in *Freeman v. Summers*. It also asserted that there had been fraud and favoritism in the issuance of patents. This raised a cry of scandal in the press. The *New York World* paid Mr. Kelley some $12,000.00 for his story, and the matter became something of a sensation. There was thus great publicity, and Mr. Wilbur, the then Secretary of the Interior, answered the charges. There was thus great interest in the matter largely because the Teapot Dome scandal had but recently quieted down. The Teapot Dome scandal was, of course, of nationwide interest and involved several leading business figures, and resulted in the conviction of the Secretary of the Interior Fall. The matter concerned bribes for the issuance of oil and gas leases in Teapot Dome and Elk Hills.

Congress began an investigation into the charges made by Mr. Kelley. The Senate Committee was headed by Senator Walsh, who had been a leading figure in the Teapot Dome investigations which had, of course, centered on the Interior Department's oil and gas leasing practices.

We are only concerned because the interest of Congress was intense, and the investigation was very significant for the problem before us for the reason that it centered directly upon the standards used to examine oil shale patent applications, and because it was specifically directed to the decision of *Freeman v. Summers*. In fact, the first day of the Senate hearings, Solicitor Finney who had drafted the *Freeman v. Summers* opinion (52 L.D. 201) appeared and was questioned about it. The opinion in *Freeman* would not otherwise be of much significance, but it became important by reason of the fact it was the center of attention of the House and Senate Committees.

The investigations by Congress were thus intensive upon the very matters concerned in this case, and Congress was thus fully informed on Interior's view and handling of the "valuable mineral deposit" element of locations for oil shale described above. We must conclude that Congress approved the departmental standards as set out in the *Freeman* case and in the Instructions as proper application of the mining laws. There were, of course, many things Congress could have done to change the practice as this was a matter of interpretation of the mining laws, and wholly within Congressional authority to change.

The House Committee concerned with the investigation recommended some legislation which would have put a deadline on filing applications for patent of oil shale claims (H.R. 2537, 71st Cong., 3d Sess.). Senator Nye, then Chairman of the Senate Committee, wrote a letter, at the conclusion of the hearings, to the Secretary of the Interior. This letter of April 1931 in part said:

"Responding now to your letter of April 10, I have conferred with Senator Walsh and beg to advise that there is no reason why your Department should not proceed to final disposition of the pending applications for patents to oil shale lands in conformity with the law."

After the above advice, the Department resumed the examination of oil shale patent applications per the Instructions and *Freeman v. Summers*, along with all the other patent applications. There were about 1149

oil shale patents issued thereafter until issuance was abruptly stopped in 1961.

The record shows also that the Department of Justice conducted in 1930 an investigation of the same matters, and a report was filed in October 1930, and Secretary Wilbur was advised.

Thus we have what appears to be a unique situation where Congress made an intense investigation into Interior's interpretation of the mining laws as to a very specific and narrow circumstance, and approved it. This indeed bears no resemblance to the many Congressional silence cases, and removes any uncertainty as to whether the matter actually received attention, and also constitutes an express determination that the practice had indeed become part of the mining laws and properly so.

As mentioned above, the Department continued after the Congressional investigation to handle the patenting of oil shale claims, and the discovery-value element as before. This appears to be what Congress intended.

There was another interaction between Interior and Congress some twenty-five years after the investigation relating to oil shale claims. This arose in 1955 and 1956. There had developed during the previous years some conflicts between shale claims going to patent and homestead entries. The Act of July 17, 1914, 30 U.S.C. § 121, permitted homestead entries to be patented although there might be valuable minerals thereon, including "oil," if the minerals were reserved to the United States. This problem is described in our opinion in *Brennan v. Udall*, 379 F.2d 803 (10th Cir.). We there said:

"Although the position of the Department of the Interior has varied over the years as to the form of the reservation in patents embracing oil shale lands, it is abundantly clear that for fifty years it has consistently construed the 1914 Act to authorize the classification of lands containing oil shale deposits as a valuable source of petroleum and nitrogen and to require the reservation of such deposits where patents are issued. The Department's construction of the statute has been made a matter of public record on numerous occasions. . . ."

The other side of the homestead-shale claim conflict concerned patents sought by shale claim locators whose claims included land within the 1914 Act homestead patents. The Department's practice was to require the person seeking the oil shale patent to purchase the surface within the claim boundaries and convey it to the United States. Legislation was sought to change this requirement to permit the claim to go to patent although the surface was not owned by the United States. Interior supported this legislation and submitted a response to a request by Senator Murray for comment. This statement of the Secretary in part said: ". . . The problem which S. 2115 is presumably intended to clear up concerns the valid and subsisting rights acquired by discovery and location under the mining laws made prior to the enactment of the Mineral Leasing Act of February 25, 1920. . . ." The statement continued: "Though we heartily endorse the purpose of S. 2115 we believe certain amendments . . . ." Thus again Congress and the Department acted to permit the patenting of oil shale claims. This was to make the patenting less burdensome on the locators and to recognize the rights acquired by the pre-1920 discovery "under the mining laws."

The Mountain Boy Claims 6 and 7 were located in 1918, and a second application for patent was filed in 1958 after a series of title problems was resolved. The final certificate was issued for patent and the file was sent to Washington for review and issuance of a patent. Assessment work had been done through the years. The Shoup Claims 1, 2, 3, and 4 were located in 1917. There was development work performed, including construction of a plant. There were some accidents, and a long period of litigation. The claims were challenged in 1928 and they were held to be valid by the Department in 1935 after hearings.

The two groups of claims are contiguous, are located in Garfield County, Colorado, in Section 14 and Section 23, of Township 7 South, Range 97 West, 6th Principal Meridian.

The claims were considered to be properly located under the 1916–1920 standards by the parties. The hearings herein as to current conditions included testimony by the Interior witnesses that there were large deposits of Green River Formation oil shale on the claims. The record shows there was a thickness of 500 to 600 feet of shale which would yield 96,000,000 barrels of oil per claim, and an additional 95 feet of shale which would yield some 20,000,000 more barrels of oil per claim. An Interior witness testified that shale from these claims could have been marketed at a profit when they were located, and at present. Dr. Vogelz testified for Interior that oil shale has had a value from 1917 to the present. The cost studies prepared by the Department also showed that a profitable operation was possible.

■ It is apparent under *Cole v. Ralph*, 252 U.S. 286, 40 S.Ct. 321, 64 L.Ed. 567, that a locator or owner of an unpatented claim, properly located, has a vested property interest therein. This has been universally recognized by the courts. Thus, if we recognize that the Department has acknowledged that there was a valuable mineral deposit in 1920, and at the time the claims were located, there is no discovery defect as to the locations. Since this was the only defect asserted in the contest, we must assume that the claims were valid as unpatented claims under departmental standards up until the 1961 change of policy by the Department which was sought to be applied retroactively. The owners of the claims thus had a vested property interest in the claims, unless in 1961 oil shale was not a valuable mineral deposit in 1920.

As mentioned at the outset, the Department filed proceedings to contest the claims described in the preceding paragraph. The Administrative Law Judge concluded they were valid; the Department of the Interior held them to be void; and the District Court decided that they were valid and should not have been cancelled.

■ The contest of these claims in 1961 marked a complete departure by the Department from the rules, the instructions, and the standards of the Department which had prevailed without exception, departure, or variation from 1915. It is also apparent from the departmental position expressed in 16 IBLA 112 (1974) that the decision of the Department reversing the Administrative Law Judge represented a complete abandonment and reversal of everything which had gone before as to "discovery" on oil shale claims. Thus the Department concluded:

". . . Accordingly, we are not concerned with the assessment work requirements of 30 U.S.C. § 28 (1970), but with the question of discovery within the meaning of the mining laws. We hold that no discovery of a valuable mineral deposit has been established on the claims at issue herein."

The IBLA opinion is quite long. It discussed *Castle v. Womble*, and the prudent man test for "valuable," and the marketability test. It also reviews the history of oil shale. It recites that: "Between 1920 and 1960 the Department consistently recognized oil shale as a valuable mineral deposit," and refers to *Freeman v. Summers*. It asserts that there could have been no reliance on departmental policy. The substance of the opinion is that the Department no longer considers oil shale to be a valuable mineral deposit under the mining laws. No reason is given for the complete departure from the previous holdings. It is apparent that no changes in circumstances relative to oil shale and its development have come about. It is purely a change in departmental policy which came about by a change in the philosophy of the personnel. Thus in 1920 the Department said oil shale was "valuable" then, and in 1961 and 1974 the Department says oil shale was not "valuable" in 1920. The question is whether such a policy change can bring about the consequences sought to be obtained by the Department, considering all that has taken

place in the forty-year period. It must be pointed out that the Department since 1920 has been seeking to lease oil shale under the Mineral Leasing Act to persons who would undertake development and was able to obtain in 1974 a 210-million dollar bid on a tract offered for lease.

We must hold that the Department is not free to so change the application of the general mining laws as to the oil shale locations here under consideration. The different treatment afforded all oil shale claims as to the "valuable mineral deposit" element of a location became a part of the general mining laws by reason of its adoption and approval by both Houses of Congress during the intensive investigations of this very question and their affirmative resolution of the issue. The general mining laws were thus adjusted to accommodate the then very important practical and legal problem.

We do not put this in the category of Congressional reenactment after an administrative interpretation. There are, of course, a large number of cases in a variety of circumstances which relate to reenactments. As indicated, we are of the view that the circumstances here present take the case far beyond the doctrine set forth in these cases, and into something quite different, but they demonstrate the variety of circumstances and show the firm basis for the presumptions arising from reenactment alone. These cases were referred to by the trial court (426 F.Supp. 894), and include *NLRB v. Bell,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134, concerning "managerial employees"; *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462, "ordinary and necessary" business expenses; *Corn Products Refining Co. v. Comm'r,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, purchase of "futures"; and *see NLRB v. Gullett Gin Co.,* 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337, and *Brennan v. Udall,* 379 F.2d 803 (10th Cir.).

Instead of reenactment, and silence on the issue, as an acceptance of interpretation, we regard the events hereinabove described as an affirmative adoption of the very basic application of the mining laws to make it part of the statutory method for development of the oil shale reserves. It was obviously considered to be part of such an exploitation as the reserves were considered very essential. It is equally apparent that other events transpired to forestall the use of oil shale as a source of oil. These events included a large increase in domestic oil production and cheap foreign oil. Some of these events and the subsequent variations thereon came about through the actions of the Government. Thus Congress may have been wrong in its estimate as to the timing of oil shale development, but that is no reason to now change the mining laws without the benefit of Congressional consideration. In short, the changes here sought to be made by the Department as to 1920 standards incorporated in the mining laws are well beyond executive authority.

This is no more than an application of the doctrine developed over the years in the reenactment cases but in the presence of the added significant element described above at some length,—the extensive participation by Congress in the specific issue.

Thus in *Corn Products Refining Co. v. Comm'r,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, the Court said after referring to three reenactments of the Tax Code and recognition for twenty years: "This bespeaks congressional approval. *Helvering v. Winmill,* 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52." The Court then added the other element: "Furthermore, Congress has since specifically recognized the hedging exception here under consideration in the short-sale rule of § 1233(a) of the 1954 Code."

In *United States v. Leslie Salt Co.,* 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441, the Court considered Treasury's long-standing construction of what a "debenture" was and what was a "certificate of indebtedness." The Court referred to the *Corn Products* case, and the importance therein given to contemporaneous construction; then it said of the department's sudden change in definition:

"    .    .    Against the Treasury's prior longstanding and consistent administra-

tive interpretation its more recent *ad hoc* contention as to how the statute should be construed cannot stand. Moreover, that original interpretation has had both express and implied congressional acquiescence, . . . . ."

The Court also in *Leslie Salt* refers to its opinion in *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796.

The importance given to "contemporaneous" construction by the administrative officials must not be overlooked, and reference must be made again to *Leslie Salt.* Thus the officials in Interior from top to bottom considered the application of the mining laws to shale oil. This was "new," not, of course, as a new law but a new mineral. It was a "contemporaneous" construction also in the sense of an application of the law to a new situation, an application calling for a standard to be applied. It was in 1920 a "contemporaneous construction" to be given the specific consideration suggested by the Court. It is even more significant because of the attempted retroactive application to 1920 of this new and totally different position.

We do not reach the retroactive aspect as a separate issue. The doctrine relating to retroactive application of policy changes and statutory construction by agencies with the need for a "compelling reason" is considered in *Logan v. Davis*, 233 U.S. 613; *Rough Rider*, 41 L.D. 242, and in *James v. Bell*, 52 L.D. 197.

The combination of circumstances we have before us presents a unique situation which, as we have said above, constituted an addendum to the mining law which cannot be removed short of Congressional action. It is simply an application of the doctrine arising in the reenactment cases referred to above with special emphasis on the added element of affirmative action by Congress. The affirmative action by Congress on the point here is overwhelming.

Thus the judgment of the District Court is AFFIRMED.