UTAH INTERNATIONAL, INC., a Delaware Corporation (formerly Utah Construction & Mining Co.), Plaintiff,

v.

Cecil D. ANDRUS, Secretary of the Interior; Curtis J. Berklund, Director of the Bureau of Land Management, U.S. Department of the Interior; Vincent E. McKelvey, Director of the Geological Survey, U.S. Department of the Interior; Paul L. Howard, Utah State Director of the Bureau of Land Management, U.S. Department of the Interior; and Jackson W. Moffit, Area Mining Supervisor, Conservation Division of the Geological Survey of the U.S. Department of the Interior, Defendants.

No. C 77–0225.

United States District Court,
D. Utah, C. D.

June 15, 1979.

See also, D.C., 488 F.Supp. 976.

Robert G. Pruitt, Jr., Salt Lake City, Utah, for plaintiff.

Gerald S. Fish, Dept. Justice, Washington, D. C., Ronald L. Rencher, U. S. Atty., and Wallace Boyack, Asst. U. S. Atty., Salt Lake City, Utah, for defendants.

MEMORANDUM OPINION AND ORDER

ALDON J. ANDERSON, District Judge.

The present action for declaratory relief and mandamus is before the court on cross motions for summary judgment and defendants' motion to lodge a draft environmental statement with the court. On March 12, 1979, the court heard oral argument on the motions for summary judgment and took the matter under advisement. The parties appear to agree as to the material facts and that the controversy can properly be resolved on summary judgment.

JURISDICTION AND VENUE

The court has jurisdiction of this action by virtue of 28 U.S.C. §§ 1331(a) and 1361. Venue lies in the Central Division of this court under the terms of 28 U.S.C. § 1391(e)(3).

BASIC FACTS PERTAINING TO PLAINTIFF'S LEASE APPLICATION

The Mineral Leasing Act of 1920 authorized the Secretary of the Interior to enter into agreements for the leasing of mineral deposits on federal lands. Among the Act's provisions was the following:

> Where prospecting or exploratory work is necessary to determine the existence or workability of coal deposits in any unclaimed, undeveloped area, the Secretary of the Interior may issue, to applicants qualified under this chapter, prospecting permits for a term of two years; and if within said period of two years thereafter the permittee shows to the Secretary that the land contains coal in commercial quantities, the permittee shall be entitled to a lease under this chapter for all or part of the land in his permit.

30 U.S.C. § 201(b) (1971) (repealed 1976). Pursuant to this authority the Bureau of Land Management (BLM) granted prospecting permits routinely upon request where the statutory requirements were met during most, if not all, of the period from 1920 to 1970. *Natural Resources Defense Counsel, Inc. (NRDC) v. Berklund*, 458 F.Supp. 925, 929 (D.D.C.1978). During that period the BLM issued "preference right leases" as a matter of right to holders of prospecting permits who timely demonstrated the discovery of coal in "commercial quantities." Memorandum for Deputy Under Secretary Lyons from Deputy Solicitor of Interior Department, March 25, 1975, at 3 (Ex. Q). At that time the United States Geological Survey (USGS) was the designated agency responsible for examining preference right lease applications to determine whether coal had been discovered in commercial quantities. In making that determination the USGS

has looked exclusively to whether the coal deposit that was discovered actually existed and was workable, i. e., whether the deposit was of such a nature that it could be mined by existing mining technology.

*Id.* at 4.

In 1966 plaintiff applied for and was granted prospecting permit U–675 on two noncontiguous parcels of land in Kane County, Utah, consisting of 80 acres and 480 acres. (Ex. A). Plaintiff was apparently granted numerous other permits at about the same time. In 1968 plaintiff was issued twelve preference right coal leases on a common seam of coal pursuant to discoveries made on land in the vicinity of that covered by permit U–675. Plaintiff secured a two-year extension of permit U–675 in 1968 and discovered coal on the 80-acre tract in January, 1970. On April 7, 1970, plaintiff submitted to the BLM an application for a preference right lease covering both the 80-acre and the 480-acre tracts. (Ex. D). On May 4, 1970, the USGS wrote to plaintiff, advising it that no showing of a discovery on the 480-acre tract had been made. (Ex. E). Plaintiff replied on September 8, 1970, by deleting from its application the 480-acre tract. (Ex. F).

On October 12, 1970, the USGS Regional Mining Supervisor in Salt Lake City wrote to his Chief, Branch of Mining Operations, in Washington, D.C., recommending issuance of a lease to plaintiff on the 80-acre tract, noting that the two holes drilled thereon had "intersected a coalbed averaging 14 feet thick at strippable depth." (Ex. H). Attached to that communication was an unsigned memorandum addressed to the BLM Land Office Manager in Salt Lake City, recommending issuance of a lease to plaintiff and stating that plaintiff "has discovered coal in commercial quantities and is entitled to a preference right lease" on the 80-acre tract. (Ex. G). This memorandum was never signed or delivered to the BLM.

In early 1971 the Interior Department imposed an informal moratorium on further coal leasing.[1] Plaintiff's lease application was neither rejected nor approved but was quietly shelved without notice of such action to plaintiff. In February, 1973, the Department relaxed this moratorium somewhat by announcing "short-term criteria" to permit the granting of lease applications under limited circumstances pending formulation of a long-term leasing program. The record does not indicate whether or not plaintiff was given notice of the short-term criteria or that its lease application would not be processed if such criteria were not met. The record reveals no further action taken specifically with respect to plaintiff's lease application until January 8, 1976, when an internal BLM "Short Note Transmittal" was prepared. (Ex. J). This brief document indicated that the USGS regarded plaintiff as qualified for the U–675 lease and requested a determination as to whether plaintiff qualified under the short-term criteria.

On May 7, 1976, the Department published new regulations defining "commercial quantities" and outlining procedures for the processing of pending preference right lease applications. 41 Fed.Reg. 18845 (Ex. K). On June 29, 1976, the BLM wrote a letter to plaintiff advising that the new regulations would be applied to plaintiff's pending application. (Ex. M). On July 1, 1976, plaintiff wrote to the BLM denying applicability of the new regulations to plaintiff's application and requesting a one-year extension of time in which to submit the additional information required under the new regulations. (Ex. N). On July 1, 1977, plaintiff submitted to the BLM such additional information and again asserted that the new regulations did not apply to plaintiff's lease application. (Ex. O). Immediately after this submission of additional information, plaintiff filed the present lawsuit.

## NATURE OF PLAINTIFF'S CLAIMS

In its motion for summary judgment plaintiff relies primarily upon the foregoing facts. Plaintiff urges the court to grant mandamus "requiring the Secretary to execute and deliver to plaintiff the preference

---

1. Page 970, *infra.*

right coal lease upon terms routinely contained in coal leases issued" in 1970. Memorandum in Support of Plaintiff's Motion for Summary Judgment, at 5. Plaintiff argues that it is entitled to such relief because it found coal in "commercial quantities" in 1970 as certified by the USGS, that the Secretary had no discretion to deny or withhold issuance of the lease, that the Department's short-term criteria developed in 1973 and the new regulations promulgated in 1976 cannot be applied retroactively to defeat plaintiff's "vested right" to a lease, and that no further administrative remedies are available to plaintiff. As a basis for such extraordinary relief, plaintiff refers the court to 5 U.S.C. §§ 555(b) (requiring administrative agencies to conclude matters "within a reasonable time") and 706(1) (providing that the "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed").

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

At the outset it is important to note that exhaustion of administrative remedies is a critical element in both plaintiff's and defendants' motions for summary judgment. Plaintiff is not entitled to the extraordinary relief sought here unless it is excused from compliance with the exhaustion requirement by the unreasonable delay or unlawful withholding of action on the part of defendants. On the other hand, defendants are entitled to summary judgment if plaintiff has failed to exhaust administrative remedies and is not excused from doing so by unreasonable delay or unlawful withholding of action. Thus, the pivotal issue is whether the undisputed facts compel the conclusion that the Department has unlawfully withheld or unreasonably delayed issuance of a lease to plaintiff pursuant to application U–675. Resolution of this issue requires the court to scrutinize the extent of the discretion, if any, conferred upon the Department in disposing of preference right lease applications.

## EXTENT OF AGENCY DISCRETION

■ Plaintiff's position that issuance of a preference right lease is mandated by 30 U.S.C. § 201(b) (1971) where the applicant demonstrates a finding of coal in commercial quantities does not appear to be disputed by the Department. Moreover, this position is amply supported by administrative practice and judicial decision. Throughout the period from 1920 to the present time, the Department appears to have held the view that the holder of a coal prospecting permit has an absolute right to a coal lease if he timely demonstrates a discovery of coal in commercial quantities. (Ex. Q at 3–4). At least until 1970 the Department's practice was consistent with that view. In *NRDC v. Berklund*, 458 F.Supp. 925, 928 (D.D.C.1978), the court held that

> the Secretary of the Interior does not have discretion to reject preference right [lease applications] where coal has been found in commercial quantities.

From the conclusion that the Secretary lacks discretion to reject preference right lease applications where coal is found in commercial quantities, it does not follow that the Secretary has no discretion whatever in acting on such applications. For instance, the Mineral Leasing Act provides:

> Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property . . . and such other provisions as [the Secretary] may deem necessary . . . for the protection of the interests of the United States, for the prevention of monopoly, and for the safeguarding of the public welfare.

30 U.S.C. § 187. This provision obviously affords the Secretary broad discretion in establishing the terms of preference right leases. Since enactment of the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. §§ 4321–4361, the Secretary has been under the obligation to interpret and administer the Mineral Leasing Act in accordance with NEPA "to the fullest extent possible." 42 U.S.C. § 4332. Thus, the Secretary is required to establish lease

terms that, to the fullest extent possible, assure protection of environmental quality. Congress also granted the Secretary broad discretion in determining lease rental and royalty terms, 30 U.S.C. § 207, the amount of land to be included in the lease, *id* § 201(b), and the presence of coal in commercial quantities.

In short, the issuance of a preference right lease is not a purely ministerial function. Instead, it is a responsibility entailing a substantial measure of administrative expertise and discretion. Thus, in order to determine whether the Secretary unlawfully withheld or unreasonably delayed action on plaintiff's lease application, the court must examine the parameters of the Secretary's discretion and the manner in which he has exercised it.

## UNLAWFUL WITHHOLDING OF ACTION

Plaintiff contends that the Secretary has unlawfully withheld action on its lease application, arguing that it acquired a vested right to a lease on April 7, 1970, when it initially submitted its lease application. Relying heavily on the fact that the Regional Mining Supervisor of the USGS in Salt Lake City wrote to Chief of Mining Operations, USGS, in Washington, expressing his view that plaintiff had found coal in commercial quantities and that plaintiff was entitled to the lease, plaintiff claims that the Secretary has unjustifiably withheld the simple ministerial act of issuing plaintiff a standard form lease on the terms contained in leases acquired by plaintiff in 1968.

This argument must fail for several reasons. The issuance of a preference right coal lease is not, and should not be, a purely mechanical, ministerial function. As discussed above, the Secretary has broad discretion in prescribing lease terms to protect the public interest and the responsibility to prescribe lease terms effectuating the purposes of NEPA to the fullest extent possible. Since NEPA was enacted in 1969, the standard form leases issued in 1968 are presumably inadequate to fulfill the Secretary's legal responsibilities under NEPA.

Moreover, the court is persuaded that a determination made by a local USGS official as to the presence of coal in commercial quantities is not binding on the USGS, the BLM, or the Secretary of Interior under the circumstances of this case. This conclusion is based on the doctrine established in a closely analogous context that:

> the Secretary of Interior has broad plenary powers over the disposition of public lands. . . . He has a continuing jurisdiction with respect to these lands until a patent issues, and he is not estopped by the principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors in interest. . . . So long as the legal title remains in the Government, the Secretary has the power and duty upon proper notice and hearing to determine whether the claim is valid. . . . Therefore, even though the BLM had determined Ideal's claim to be valid and the Assistant Secretary approved as final that determination, the Department had authority to reconsider its prior decision . . . . .

*Ideal Basic Industries, Inc. v. Morton*, 542 F.2d 1364, 1367–68 (9th Cir. 1976) (citations omitted). Thus, plaintiff did not, by virtue of the USGS finding as to commercial quantities, acquire a vested right to a lease on any terms.

However, the court has heretofore in this opinion expressed its concurrence with the rule that the Secretary does not have discretion to reject a preference right lease application where a timely showing is made that the applicant has discovered coal in commercial quantities. The Secretary does not contend that the USGS determination as to the presence of coal in commercial quantities on land covered by permit U–675 was erroneous under the standards applied prior to 1971. Instead, the Secretary maintains that the USGS's practice for 50 years of determining commercial quantities under a "workability" standard did not conform with the legislative intent embodied in the phrase "commercial quantities" as used in

the Mineral Leasing Act of 1920. The "workability" standard was satisfied by a showing that the coal deposit "could be mined by existing mining technology." (Ex. Q at 4).

The Department asserts that the regulations issued on May 7, 1976, represent the first formal administrative definition of "commercial quantities." Those regulations, codified at 43 C.F.R. § 3520.1–1(c), provide that:

A permittee has discovered commercial quantities of coal or a valuable deposit of one of the other permit minerals if the mineral deposit discovered under the permit is of such a character and quantity that a prudent person would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine. The permittee must present sufficient evidence to show that there is a reasonable expectation that his revenues from the sale of the mineral will exceed his costs of developing the mine, and extracting, removing, and marketing the mineral.

Surprisingly, there appears to be a complete absence of judicial and administrative decisions construing the term "commercial quantities." The legislative history of the Mineral Leasing Act of 1920 and of amendments thereto does not illuminate the intended meaning of the term.

Some insight, however, may be gleaned from examination of the statutory language itself. With regard to leasing of minerals other than coal, the Mineral Leasing Act provides that a prospecting permittee shall be entitled to a lease upon a timely showing of "valuable deposits" of specified minerals and, in some cases, that the land is "chiefly valuable therefor." 30 U.S.C. §§ 211 (phosphates), 223 (oil and gas), 262 (sodium), 272 (sulphur), 282 (potash). The term "valuable mineral deposits" as used in a similar statute, 30 U.S.C. § 22, has been construed by the Department as consisting of a "prudent-man test" with the further refinement of the "marketability test." The Supreme Court in 1968 upheld this construction:

Under this "prudent-man test" in order to qualify as "valuable mineral deposits," the discovered deposits must be of such a character that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine . . .." This Court has approved the prudent-man formulation and interpretation on numerous occasions. . . . Minerals which no prudent man will extract because there is no demand for them at a price higher than the costs of extraction and transportation are hardly economically valuable. Thus, profitability is an important consideration in applying the prudent-man test, and the marketability test which the Secretary has used here merely recognizes this fact.

*United States v. Coleman,* 390 U.S. 599, 602–03, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170 (1968).

 The court is persuaded that the plain meaning of coal in "commercial quantities" is precisely the same as the definition of "valuable mineral deposits" upheld in *Coleman.* If, however, any semantic distinction can be perceived between "commercial quantities" and "valuable deposits," it must be that "commercial quantities" carries the stronger implication of the element of profitability.

Finally, the court notes that the same sentence that contains the term "commercial quantities" also employs the following language:

Where prospecting or exploratory work is necessary to determine the *existence or workability* of coal deposits in any unclaimed, undeveloped area . . .

30 U.S.C. § 201(b) (1971) (emphasis added). Under the rules of statutory construction, the term "commercial quantities" must be regarded as having a meaning distinct from that of "existence or workability." Otherwise Congress would not have employed the two different phrases in the same sentence. Thus, the past USGS practice of certifying the presence of coal in commercial quantities based upon a workability test does not

appear to conform with legislative intent. It further appears that the workability test may have been a substantial factor contributing to the pervasive lack of production from coal leases and the speculative holding of prospecting permits and preference right leases.[2]

The court concludes that the regulations promulgated by the Secretary in 1976 defining "commercial quantities" correctly construe that term as it was intended by Congress. Obviously, the Secretary has considerable discretion in making the determination as to whether the commercial quantities test has been satisfied in a given case. In the present case that discretion has not yet been exercised.

The critical issue remaining for the court is whether the 1976 regulations may properly be applied to plaintiff's lease application filed in 1970. The regulations apply to preference right lease "applications pending on the effective date of this regulation." 43 C.F.R. § 3520.1–1(d). That effective date was May 7, 1976. 41 Fed.Reg. 18848. In attempting to avoid the applicability of the 1976 regulations, plaintiff argues that it acquired a vested right to a lease immediately upon filing its initial lease application on April 7, 1970. The court has indicated above that it finds this argument to be without merit.

In essence, plaintiff's contention is that it possesses a vested right to have its 1970 lease application processed under pre-1971 administrative standards, i. e., the workability test, rather than the prudent-man and marketability tests. At oral argument plaintiff cited *Shell Oil Co. v. Andrus*, 591 F.2d 597 (10th Cir. 1979), for the proposition that an administrative agency in a context such as the present one cannot retroactively apply a rule that represents a complete departure from a longstanding administrative practice. In that case the court held that the Interior Department was not free to change retroactively the special standard used in determining whether oil shale constituted a "valuable mineral deposit." This conclusion was based on the court's view that:

The different treatment afforded all oil shale claims as to the "valuable mineral deposit" element of a location became a part of the general mining laws by reason of its adoption and approval by both Houses of Congress during the intensive investigation of this very question and their affirmative resolution of the issue.

*Id.* at 604. In marked contrast to *Shell*, the present case involves no claim that Congress ever approved or even became aware of the manner in which the USGS interpreted the commercial quantities standard prior to 1971. Thus, *Shell* does not support plaintiff's position in this case. The relevance of *Shell* to this case is even more doubtful in view of the fact that in *Shell* the Department was seeking to abrogate mining claims that had been granted some 50 years previously. Here the Department does not seek to take back that which it has already granted. Instead, it seeks to determine whether or not plaintiff is entitled to the issuance of a lease.

Plaintiff's argument would lead to the conclusion that any reliance (even that as miniscule as the filing of an application) on an erroneous administrative practice would preclude the agency from correcting its error as to the person so relying. The court finds this conclusion indefensible, particularly where, as here, the administrative action in question deals with the public lands, as to which the Department performs a *proprietary* rather than purely regulatory role. The sovereign's broad authority to dispose of federal lands on the terms of its choice should not be circumscribed by novel and vague notions about vested rights in the immutability of a particular state of the law.

For the foregoing reasons the court concludes that plaintiff does not now possess and has never possessed a vested right to a lease pursuant to application U–675. Plaintiff is entitled to such a lease only if it satisfies the commercial quantities test as defined by 43 C.F.R. § 3520.1–1(c). Plain-

2. *See* pages 970–971, *infra.*

tiff has presumably made only the "initial showing" required by 43 C.F.R. § 3521.1–1. Thus, its application is not yet ripe for final action. Moreover, since September 27, 1977, the Secretary has been under injunctive order restraining him from processing or acting on coal lease applications except under extremely limited circumstances not shown to be present here.[3] Accordingly, the court concludes that the Secretary has not unlawfully withheld action on lease application U–675 within the meaning of 5 U.S.C. § 706(1).

Insofar as plaintiff's claim that the Secretary has unlawfully withheld action is based on delay in disposing of plaintiff's application, rather than on a theory of vested rights, such claim is essentially identical to the claim of unreasonable delay. That claim is discussed in the following portion of the court's opinion.

### UNREASONABLE DELAY

Prior to 1970 the Secretary appears to have exercised his discretion with regard to federal coal leasing by

> responding to lease requests on a case-by-case basis without regard to the total reserves under lease or the need for additional leasing, and without an assessment of the environmental impacts of leasing.

*NRDC v. Hughes*, 437 F.Supp. 981, 983–984 (D.D.C.1977). Holders of prospecting permits were routinely granted leases upon a timely showing of the discovery of coal in "commercial quantities," as determined by the USGS. In making that determination the USGS

> has looked exclusively to whether the coal deposit that was discovered actually existed and was "workable", i. e., whether the deposit was of such a nature that it could be mined by existing mining technology.

(Ex. Q at 4).

A BLM study issued in November, 1970, reported that from 1945 to 1970 leased coal acreage on federal lands in six western states (including Utah) rose from 80,000 acres to 788,000 acres while production from federal coal leases declined from 10 million tons to 7.4 million tons. The study noted that only 8.5% of existing federal leases were producing coal in 1970. *NRDC v. Hughes*, 437 F.Supp. 981, 984 (D.D.C.1977); Draft Environmental Statement, Federal Coal Management Program (Dec.1978) at 1–1, 1–10. In response to these findings, the Secretary directed the BLM in 1971 to suspend issuance of coal leases and coal prospecting permits. Draft Environmental Statement, *supra*, at 1–10; H.Rep.No.94–681, 94th Cong., 2d Sess. 11 (1975), *reprinted in* 3 U.S.Code Cong. & Admin.News at 1943, 1947 (1976) [hereinafter cited as House Report].

This moratorium continued until February, 1973, when the Department announced a new coal leasing policy consisting of short-term and long-term actions. For the short term, the Secretary announced "short-term criteria" extending the moratorium on issuance of coal prospecting permits. These criteria relaxed somewhat the moratorium on issuance of coal leases in that they permitted leasing under certain exigent circumstances. These short-term criteria remained in effect with respect to preference right leasing until May 7, 1976.

The long-term portion of the Department's new coal leasing program was announced in October, 1973. *NRDC v. Hughes*, 437 F.Supp. 981, 984 (D.D.C.1977). A draft programmatic environmental impact statement (EIS) was thereupon prepared and was filed on May 7, 1974. *Id.* at 985. There followed a substantial period of public comment on the proposal. The Environmental Protection Agency and the Council on Environmental Quality sharply criticized the draft statement, requesting that a new statement be prepared. *Id.* The Department elected not to prepare a new statement but instead modified the long-term program and released the final programmatic EIS in September, 1975. *Id.*

On January 26, 1976, the Secretary announced the implementation of the modi-

---

3. Page 971, *infra*.

fied long-term program, designed to end the six-year moratorium on major leasing while retaining the short-term criteria until the new program was operational. *Id.* at 986. In early 1976, the General Accounting Office made public its findings that the need for a new coal leasing program had not been established and that the Department's new system was not workable in any event. *Id.* Despite this criticism the Secretary promulgated new regulations on May 7, 1976. 41 Fed.Reg. 18845 (Ex. K). These regulations defined "commercial quantities," established procedures for processing preference right lease applications, and announced that the regulations would be applied to both future and pending applications of that type. The Secretary further indicated that applications meeting the short-term criteria would be processed first.

As recited previously, plaintiff was notified on June 29, 1976, that its application U–675 was subject to the new regulations. On July 1, 1976, plaintiff requested one year in which to submit the additional information. Such information was submitted to the BLM on July 1, 1977. In the meantime, however, the picture was altered by significant actions in the legislative and judicial branches of government.

Turning first to the legislative developments, the court notes that the Federal Coal Leasing Amendments Act of 1975 became law on August 4, 1976. Pub.L.No.94–377, 90 Stat. 1083 (1976). This Act substantially amended the Mineral Leasing Act of 1920, repealing 30 U.S.C. § 201(b), "subject to valid existing rights," thereby abolishing the preference right prospecting permit and requiring all leasing to be on a competitive basis. *Id.* § 4 at 1085. The legislative history of that Act contains strong expressions of public policy in the federal coal management context. One of the major concerns voiced by Congress was the problem of speculation in federal coal at public expense. House Report, *supra,* at 11, 14–15, *reprinted* at 1946, 1950–51. The Report quotes the following statements by the Ford Energy Policy Project:

The coal leasing program presents a clear picture of private speculation at the public expense. In the past decades, but particularly during the 1960's, vast amounts of Federal coal passed freely to private ownership under situations of little or no competition and extremely low payments.

*Id.* at 1946. The Report identified particular defects in prior law that permitted such speculation:

In addition to the lack of development of existing leases, the provision of the existing .law which allows issuance of preference rights associated with coal prospecting permits (Section 2(b)) has contributed to speculative holding of leases by making it possible to gain control of public resources at virtually no cost. . . . Consequently, holding companies and energy resource speculators have entered the market for Federal coal in large numbers. An unpublished Department of the Interior working paper concludes that:

By far the dominant force in the acquisition of coal prospecting permits is the "lease broker". Of the top 20 coal permit holders, on an acreage basis, only four are actively engaged in production of coal . . . . Suffice it to say that brokers—not coal producers or users—are the predominant holders of Federal coal prospecting permits.

*Id.* at 1950. The Report contains data indicating that plaintiff is the third largest holder of federal coal leases (in terms of acreage). *Id.* at 1951. There is no evidence before the court, however, to indicate whether or not plaintiff is actively engaged in coal production on federal lands.

The Report specified other perceived problems sought to be corrected by the Act. Among those to which the preference right leasing system contributed were lack of fair return to the public. *Id.* at 1953. The Report also expressed great concern at the lack of environmental protection and land use planning in federal coal leasing practices, *id.* at 1954–55, and the marked lack of production from existing leases, *id.* at 1945–47, 1956–57.

Other recently enacted legislation affecting federal coal leasing includes the Federal Land Policy and Management Act of 1976, 90 Stat. 2743 (1976); the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 445 (1977); and the Department of Energy Organization Act, 91 Stat. 565 (1977).

In the judicial sphere, environmental groups have filed several suits against the Interior Department, attempting to block federal coal leasing actions. One such suit was filed in July, 1973, soon after the Department announced its short-term criteria. *Kleppe v. Sierra Club*, 427 U.S. 390, 394, 96 S.Ct. 2718, 2723, 42 L.Ed.2d 576 (1976). The suit attempted to prevent development of federal coal reserves in the "Northern Great Plains" region until a comprehensive regional EIS was prepared. In reversing the Court of Appeals, the Supreme Court rejected the claims made by the plaintiffs, finding that "all proposals are for actions of either local or national scope." *Id.* at 399, 96 S.Ct. at 2725. The Court recognized that certain local actions by the Department may require impact statements. In addition, the court noted that

> federal petitioners agreed at oral argument that [NEPA] required the Coal Programmatic EIS that was prepared in tandem with the new national coal-leasing program and included as part of the final report on the proposal for adoption of that program. *Their admission is well made, for the new leasing program is a coherent plan of national scope, and its adoption surely has significant environmental consequences.*

*Id.* at 400, 96 S.Ct. at 2725 (emphasis added) (citation omitted).

Of more direct importance to the present case is an action filed about 1976 by the Natural Resources Defense Council (NRDC), the Environmental Defense Fund, and other organizations against the Interior Department. That action sought to enjoin the Department from issuing any coal leas-es or taking steps to implement the new coal leasing program until an adequate programmatic EIS was prepared and other environmental legislation complied with by the Department. *NRDC v. Hughes*, 437 F.Supp. 981 (D.D.C.1977). On September 27, 1977, Judge Pratt granted plaintiffs' motion in *Hughes* for summary judgment, holding that the Department's final programmatic EIS released in September, 1975, was inadequate. *Id.* at 992. The court therefore enjoined the Department "from taking any steps whatsoever, directly or indirectly, to implement the new coal leasing program, including . . . issuing any coal leases" except under extremely limited exigent circumstances. *Id.* at 993. The court specifically ruled that

> For the purposes of this injunction and compliance with NEPA, "preference right" leasing will also be enjoined until the Programmatic EIS deficiencies are remedied.

*Id.* at 992 n.22.

Although the Department appealed this decision, the circuit court remanded the case on May 19, 1978, for amendment of the decree pursuant to a joint motion of the parties, who had reached an agreement to settle the action. On June 14, 1978, Judge Pratt entered an amended order reducing in certain respects the extent of the injunction. *NRDC v. Hughes*, 454 F.Supp. 148 (D.D.C.1978). In response to a directive from the Court of Appeals,[4] Judge Pratt elaborated on his reasons for including preference right leasing within the terms of the injunction. The modified order enjoined the issuance of preference right coal leases but relaxed the earlier order by permitting the Secretary to *process* 20 of the pending applications that involve the least environmental impact.

Insofar as the court is advised, the *Hughes* injunction remains in effect to date. On its face it prevents the Secretary from granting plaintiff's lease application U–675. Plaintiff attempts to discredit the *Hughes* injunction by arguing:

---

4. The Court of Appeals apparently requested this elaboration for the purpose of resolving an appeal by Utah Power & Light, an intervenor in *Hughes*. UP&L contended that the injunction was invalid because it violated the rights of preference right lease applicants. *Id.* at 153.

That case did not go to trial but was settled by stipulation. . . . By the terms of the stipulation the Secretary has enjoined himself for the present time, from issuing any coal leases . . . .

. . . In essence, the Amended Order approved and adopted a settlement entered into between certain of the parties. It was certainly not a litigated Order from which an appeal could follow. Memorandum in Support of Plaintiff's Motion for Summary Judgment, at 10–11. The court is disturbed by the serious lack of candor displayed by plaintiff's counsel in making such statements. The September 27, 1977, order granting summary judgment in *Hughes* was obviously a litigated decision. The Secretary appealed that decision. The fact that the decree was subsequently amended pursuant to a stipulation of the parties provides no basis for disregarding the injunction. The modified order allowed the Secretary greater freedom to process and grant lease applications than did the prior order. Moreover, plaintiff's argument that the order was not appealable is frivolous in view of the fact that Utah Power & Light has appealed the decision, contending that preference right leases should not be subject to the injunction. Insofar as the court is advised, that appeal is apparently pending at the present time.

Another recent decision affecting the present controversy is *NRDC v. Berklund*, 458 F.Supp. 925 (D.D.C.1978). In that case environmental groups sought a declaratory judgment that the Secretary has discretion to reject preference right lease applications and that the Secretary must prepare an EIS on any proposed issuance of a preference right coal lease where such action would constitute major federal action significantly affecting the environment. The plaintiffs also sought an injunction restraining the Department from issuing such leases without preparing EIS's where required. The court held that the Secretary does not have discretion to reject preference right lease applications on environmental grounds alone where coal has been found in commer-

cial quantities. *Id.* at 928, 935–37. The court further held that

NEPA demands . . . that a detailed and informed analysis of the environmental costs be prepared and available prior to the issuance of the lease.

*Id.* at 939. The court entered an order on June 30, 1978, enjoining the Secretary from issuing any preference right coal lease without first preparing an EIS where the issuance of such a lease "would constitute a major federal action significantly affecting the environment." (Ex. V at 24).

The foregoing exposition of administrative, legislative, and judicial developments of the past decade that have affected preference right coal leasing is far from exhaustive. It serves, however, to emphasize a number of factors that are important in determining whether the Department unlawfully withheld or unreasonably delayed action on plaintiff's lease application.

First, the court notes that the Department's coal leasing practices prior to 1971 were seriously deficient as measured by the public policy criteria articulated by Congress in 1975. *See House Report, supra*, at 9–21, *reprinted* at 1945–57. The Department apparently first perceived this deficiency in late 1970, a date coinciding closely with plaintiff's letter withdrawing the unexplored 480-acre tract from its U–675 application. The Department reacted to this realization by suspending further leasing and granting of prospecting permits, apparently for the purpose of gaining time in which to formulate a new course of action.

Second, the enactment of NEPA in 1969 has materially aided the transformation of federal coal leasing into a complicated and cumbersome process. Substantial delays pending preparation of EIS's and the implementation of new regulations appear to be inherent in such a labyrinthine process. For at least five years since mid-1973, the Department has been continually confronted by litigation seeking to prevent coal leasing for environmental reasons. In each of the *Kleppe, Hughes,* and *Berklund* cases described above the Department was enjoined, at some stage of the litigation, from

taking action in furtherance of its coal leasing program.

Third, federal coal leasing is a matter of the highest public importance, requiring a careful and delicate balancing of competing interests. It involves tradeoffs between public and private interests, and it requires difficult choices between national energy needs and environmental concerns. Pressures created by these conflicting interests have generated a wave of legislative, judicial, and presidential directives to the Interior Department, repeatedly forcing it to adjust its policies and practices. These facts emphasize that the Department's task is complex and that this area of law and policy has been in a state of flux during the past ten years.

In assessing whether the Department has unreasonably delayed action on plaintiff's lease application, the court is persuaded that the facts recited above are of critical importance. In other words, the propriety or impropriety of the lengthy delay of which plaintiff complains should not be considered in a vacuum. Although the question of how much delay is unreasonable is inherently metaphysical, the court should not limit its focus to the number of years elapsed since plaintiff filed its application. Instead, the court should examine all the relevant circumstances in order to weigh intelligently plaintiff's interest in prompt action against the countervailing public interests.

In this case plaintiff has not demonstrated or even alleged that there is any urgency in obtaining a lease. Although plaintiff holds leases on land adjoining the 80-acre tract that is the subject of application U–675, it does not claim that development of that adjoining property is imminent. Plaintiff does not claim that it has any plans whatever for mining the coal for which it already holds leases. Plaintiff's real concern appears to be that if it is granted a lease on U–675, the terms of that lease will be less favorable to plaintiff than the terms of its leases on nearby land, or that its lease application will be rejected by virtue of retroactive application of the Department's 1976 regulations. Thus, the interests on which plaintiff relies in this case may be summarized as a generalized interest in prompt administrative action and a particular interest in having its 1970 lease application processed under pre-1971 administrative standards rather than the stricter standards sought to be applied by the Secretary.

■ On the other side of the balance are important public interests. The public has a generalized interest in having administrative matters resolved in an orderly fashion by agencies having the expertise and discretion to deal competently with such matters. In the present context the public has an obvious interest in the judicious use of federal lands and in obtaining a fair return for federally owned coal. The public also has an important interest in the protection of environmental quality. The court is persuaded that the major share of the Department's delay in acting on plaintiff's lease application was an unavoidable by-product of the Department's good faith efforts to protect these public interests. These efforts have been prolonged at times by court injunctions and other factors beyond the Department's control.

In view of all the circumstances of this case, the public interests clearly outweigh plaintiff's interest in prompt administrative action for a coal lease on federal land where no claim is made that exigent circumstances necessitate prompt action. The court is accordingly persuaded that the Secretary has not unreasonably delayed action on plaintiff's lease application U–675 within the meaning of 5 U.S.C. § 706(1), nor has it violated the mandate of 5 U.S.C. § 555(b) to conclude this matter within a reasonable time.

## FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

■ In view of the court's conclusion that defendants have not unlawfully withheld or unreasonably delayed action on plaintiff's lease application, plaintiff is not excused from the general requirement that it exhaust its administrative remedies before seeking judicial relief. The court pre-

sumes that the Secretary will move expeditiously toward processing of and final action on plaintiff's lease application. The court recognizes, however, that significant hurdles remain in the Secretary's path toward that end and that substantial additional time may be required to clear them. Plaintiff's contention that it has no further remedy other than apparently interminable waiting ignores the fact that administrative proceedings now in progress are necessary to fulfill the Department's obligations under NEPA, as well as its duty to deal with federal coal lands in a manner consistent with other federal laws and the public interest.

The court's holding that plaintiff is not excused from the exhaustion requirement in this context is supported by several recent decisions in cases similar to the present one. Plaintiff relies on *Kerr-McGee Chemical Corp. v. Kleppe*, Civil No. 76–0608 (D.D.C., Sept. 29, 1976), in which it was held that the passage of nearly seven years without final action on a preference right lease application (phosphate) was an "inordinate delay" that "cannot be condoned." That court issued mandamus compelling the Secretary to issue leases to Kerr-McGee immediately. On appeal, however, the Circuit Court reversed, issuing an unpublished per curiam judgment remanding the action to the trial court with instructions to dismiss the action. *Kerr-McGee Chemical Corp. v. Andrus*, 187 U.S. App.D.C. 426, 574 F.2d 637 (D.C.Cir. 1978). The court's only explanation for the reversal was:

> The ongoing administrative proceedings before the Secretary of the Interior were aborted by the issuance of the writ of mandamus by the District Court. Appellee should have exhausted its administrative remedies before seeking the writ or petitioning for judicial review.

The United States Supreme Court denied Kerr-McGee's petition for certiorari on October 2, 1978. 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193.

Another case similar to the present one is *Global Exploration and Development Corp.*

*v. Andrus*, Civil No. 78–0642 (D.D.C., Aug. 14, 1978). In that case Global sought to compel the Secretary to issue preference right phosphate leases for which application had been made in 1971 and 1972. The court refused to grant plaintiff relief, finding that

> plaintiff has failed to exhaust viable and ongoing administrative remedies and must do so prior to seeking judicial review or obtaining a writ of mandamus.

At oral argument plaintiff advised the court of a recent decision in *Utah International, Inc. v. Andrus*, Civil No. 77–K–595 (D.Colo., Feb. 26, 1979), which involved issues nearly identical to those raised in the present action. The court held:

> 3. This Court specifically finds that a ten-year delay is unconscionable, it is unreasonable, and it violates any test of due process of law.
>
> 4. It is beyond the authority of this Court at this time to order by mandamus that the defendants herein issue a specific lease; however, it is within the power of this Court to direct that the defendants issue a decision which shall be a final administrative decision with respect to plaintiff's pending application.

The court's order did not mention the requirements of NEPA or the constraints of the *Hughes* injunction. Neither did it indicate whether or not the 1976 regulations were applicable to plaintiff's lease application.

The court agrees that the passage of some nine years since the filing of lease application U–675 without final administrative action is unfortunate and undesirable. The court is disturbed by the apparent lack of communication between the Department and plaintiff as to the status of the application from 1970 to 1976. Nevertheless, in view of the circumstances of this case, the court is unable to conclude that the Secretary has unlawfully withheld or unreasonably delayed action. Accordingly, plaintiff is required to exhaust its administrative remedies before seeking judicial relief. Plaintiff having failed to do so, this action must be dismissed.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted. This action is dismissed without prejudice to an action for judicial review of the final administrative action on plaintiff's lease application.

IT IS FURTHER ORDERED that defendants' motion to lodge the Draft Environmental Statement, Federal Coal Management Program (Dec. 1978) is granted. The court finds that document to be admissible both as evidence of its preparation and publication and as evidence of the activities of the Department under Rule 803(8)(A), Federal Rules of Evidence.